UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


| | | |
|---|---|---|
| MICHELLE O'DAY, | ) | CASE NO. 3:17CV1980 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |


Plaintiff Michelle O'Day ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1. In her brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ") erred in his treatment of the opinions of the physicians in the record, failed to consider her physical impairments besides her obesity, and lacked substantial evidence for his physical and mental residual functional capacities ("RFC") for her.  ECF Dkt. #16.  For the following reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

**I.  FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on May 8, 2014 alleging disability beginning November 12, 2013 due to depression, anxiety, and bipolar disorder.  ECF Dkt. #11 ("Tr.") at 75, 90, 105, 150, 223-231, 247-253.[2]  The Social Security Administration ("SSA") denied her

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled.  This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

applications initially and upon reconsideration. *Id.* at 75-136, 141-166.  Plaintiff requested a hearing before an ALJ, and the ALJ held a hearing on March 24, 2016, where Plaintiff was represented by counsel and testified.  *Id*. at 30.  A vocational expert ("VE") also testified.  *Id.*

On June 2, 2016, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI.  Tr. at 14-25.  Plaintiff appealed that determination to the Appeals Council and the Appeals Council denied her request for review on July 17, 2017.  *Id*. at 1-5.

On September 20, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  She filed a merits brief on February 15, 2018 and Defendant filed a merits brief on March 16, 2018.  ECF Dkt. #s 16, 18.  Plaintiff filed a reply brief on April 20, 2018.  ECF Dkt. #22.

**II.**      **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

**A.**      **MENTAL HEALTH EVIDENCE**

On August 14, 2013, Plaintiff self-referred to Unison Behavioral Health Group for depression and anxiety.  Tr. at 341.  She reported depression since she got divorced four years ago, and she reported anxiety attacks, shaking, stress, crying all of the time, no energy, insomnia, and isolating herself.  *Id*.  Plaintiff indicated that she had four children, ages 23, 21, 3 and 10 months.  *Id.*  The oldest two children were from her marriage and the two youngest were from her relationship with her boyfriend of four years.  *Id.*  She indicated that she was stressed because it was the three-year anniversary of the death of her boyfriend's sister.  *Id.*

Plaintiff reported that she was a high school graduate, but she was learning disabled, and she indicated that she last worked five years ago at a daycare.  Tr. at 341.  She further indicated that she was supporting herself through alimony from her ex-husband but it had recently stopped and she was now getting help from her mother and her boyfriend.  *Id*.

Plaintiff further reported that she had no physical pain and had no problems with alcohol or drugs.  Tr. at 342.  She reported a depressed mood, anxiety, anger, inattention, traumatic stress, sleep problems, psychosocial stressor of limited income, and disturbed reality contact as she indicated that she saw shadows off and on for the past five years, but they were primarily where she used to live.  *Id*. at 343.  She indicated that she had not seen the shadows since she moved.  *Id*.

-2-

Professional Clinical Counselor Bethany assessed Plaintiff and diagnosed her with major recurrent depressive disorder, severe without psychotic features, anxiety disorder not otherwise specified, and she recommended individual therapy and a psychiatric evaluation with Dr. Kazmi. *Id.* at 343-344.

Plaintiff met with different counselors from August 2013 through December 2013 and her mood was anxious and depressed, and she was tearful, but cooperative.  Tr. at 362-363, 372-381, 390-391.  She denied hallucinations and reported that she had an emotionally abusive boyfriend. *Id*.    On November 12, 2013, Plaintiff met with Dr. Kazmi for a psychiatric evaluation.  Tr. at 301, 341-348.  Plaintiff indicated that she wanted help for her depression and mood swings, stating that she was never happy and had mood fluctuations.  *Id*. at 346.  She reported that she felt like she used to see things, she had sleep problems occasionally, and her energy level was down.  *Id*.

Dr. Kazmi noted that Plaintiff was cooperative, with a sad affect, good eye contact, normal speech, logical thought process, and no evidence of suicidal ideation or hallucinations.  Tr. at 347. Plaintiff's immediate recall was good and her intelligence was estimated to be average to low average.  *Id*.  He indicated that Plaintiff's judgment and insight were fair. *Id*.  He diagnosed Plaintiff with recurrent major depressive disorder and determined her global assessment of functioning ("GAF") at 55, indicative of moderate symptoms.  *Id*.  He gave her a trial of Zoloft and recommended that she continue with counseling.  *Id.*

Plaintiff reported in January of 2014 to her counselor that she felt trapped in her own home, felt depressed, and wondered why she was born.  Tr. at 370.  She reported mood swings, which were previously not documented.  *Id.*

On January 31, 2014, Plaintiff presented to Dr. Kazmi for medication management, and she reported that she was not taking her medication for the past three weeks because a nurse scared her by saying that taking the medication while nursing was not safe.  Tr. at 350.  Plaintiff indicated that she felt the same whether she was on or off the medication.  *Id*.  Dr. Kazmi noted that Plaintiff was cooperative, with a sad mood, incongruent affect, normal speech, logical thought process, intact memory, no evidence of suicidal ideation or hallucinations, and fair insight and judgment.  *Id*.  Her diagnosis was the same and he prescribed Wellbutrin and Trileptal.  *Id*.

-3-

Plaintiff continued with individual therapy and met with her therapist, Ms. Graff, bimonthly throughout 2014 where they discussed her stressors of her ex-husband getting remarried, the treatment of her children by her mother and the children's paternal grandmother, caring for her children, and her lack of support. Tr. at 356-390, 439-440, 443-450, 453-460, 463-468. Plaintiff reported in June of 2014 that she was having mood swings, depression and anxiety, and she was having visual hallucinations of people laughing at her and she once saw the devil. *Id.* at 358. She also reported that in the past, she heard a male voice speaking to her. *Id.* She was also angry and irritated. *Id*. Ms. Graff found that Plaintiff was depressed and anxious, with a blunted affect, racing thoughts, good eye contact, calm motor activity, adequate concentration, appropriate speech, intact memory, and normal intellect. *Id*.

On April 24, 2014, Plaintiff presented for medication management with Dr. Kazmi, and she reported that she did not take her medication for awhile and was not doing well, so she restarted her medication the day prior. Tr. at 351. Dr. Kazmi found that Plaintiff was alert, oriented and cooperative, with normal speech rate, tone and volume, normal psychomotor activity, a sad mood, incongruent affect, intact memory, fair insight and judgment, and a denial of hallucinations. *Id*. Her diagnosis was the same and Dr. Kazmi continued Plaintiff's Wellbutrin and Trileptal. *Id.*

In her May 28, 2014 session with Ms. Graff, Plaintiff reported that she was able to take her children to a minor league baseball game and stayed there for two hours without feeling overwhelmed or panicked. Tr. at 368. She discussed different programs that she could take her family to, but she doubted her ability to stay calm if she attempted to go to one of these programs. *Id*. Plaintiff did also take her children to a trunk or treat for Halloween at her oldest daughter's place of employment in October of 2014. *Id*. at 456.

Therapy notes from July 7, 2014 indicate that Plaintiff was reporting increased stress and more hallucinations. Tr. at 447.

Plaintiff presented for medication management with Dr. Kazmi on July 15, 2014 and reported that she did not like taking her medications, but when she did take them, they were helpful to a limited extent. Tr. at 429. Plaintiff indicated that her younger children's father was verbally abusive to her and she had very limited social support. *Id*. Dr. Kazmi noted that Plaintiff was alert,

-4-

oriented and cooperative, with normal speech rate, tone and volume, normal psychomotor activity, a sad mood, incongruent affect, intact memory, fair insight and judgment, and a denial of hallucinations. *Id*. Her diagnosis was the same and Dr. Kazmi increased Plaintiff's Buspar, Wellbutrin, and Trileptal dosages. *Id.*

Plaintiff reported to her therapist on July 23, 2014 that she was having hallucinations that told her "to fuck people up next door." Tr. at 445. Ms. Graff found that Plaintiff was depressed and anxious, with a blunted affect, she was thought blocking, was passive and restless, made good eye contact, had appropriate speech, intact memory, and adequate concentration. *Id.*

On August 4, 2014, state agency psychologist, Dr. Semmelman, Ph.D., completed a mental RFC for Plaintiff. Tr. at 80-81, 84-86, 95-96, 99-101. She opined that Plaintiff could: interact occasionally and superficially; receive instructions and ask appropriate questions in a smaller or more solitary and less public to nonpublic setting; would do best in a more solitary and nonpublic work setting with no over the shoulder supervision; and could cope with ordinary and routine changes in work settings which were not fast-paced or that had high production demands. *Id*. at 87.

On August 20, 2014, Plaintiff reported to her medication management nurse that she saw "shadows and faces" and she heard voices telling her "don't hurt that person" or "hurt that person." Tr. at 431. She reported that she had crying spells, but her hallucinations were less frequent when she was on her medications. *Id*. She reported that she sometimes forgot to take her medications and her condition would deteriorate. *Id.* The nurse found that Plaintiff's mood was labile, anxious and controlled, her thought process was organized, she had good eye contact, but was panicky and preoccupied, her memory was intact, and she had paranoid perceptual disturbances. *Id.*

Plaintiff reported medication compliance to Dr. Kazmi at her October 7, 2014 visit and he increased her Buspar dosage. Tr. at 430. She denied hallucinations at this visit. *Id*.

On November 4, 2014, Plaintiff reported to her nurse that she was only taking her medications about three times per week because she was breastfeeding her child. Tr. at 433. She denied hallucinations and Nurse Severhof found that Plaintiff had a stable and euthymic mood, appropriate affect, organized thoughts, she was relaxed, made good eye contact and was cooperative, she had appropriate speech, and intact memory. *Id*.

Plaintiff reported to her therapist on November 11, 2014 that she was not motivated to take her medications.  Tr. at 435, 443-444.

On November 26, 2014, Dr. Kazmi had a medication management visit with Plaintiff, who reported that she was not doing well.  Tr. at 349.  Dr. Kazmi found that Plaintiff presented as alert, oriented and cooperative, with normal speech rate, tone and volume, normal psychomotor activity, a sad mood, incongruent affect, intact memory, fair insight and judgment, and a denial of hallucinations.  *Id*.  Dr. Kazmi added Vistaril with Plaintiff's Zoloft prescription.  *Id*.

Therapy notes from the same date indicate that Plaintiff reported that she felt like hurting someone.  Tr. at 449.  She reported increased hallucinations and suicidal ideations.  *Id*.  Plaintiff indicated that she felt increased agitation and frustration after seeing the Social Security doctor the week prior.  *Id*.  She indicated that she was offended that people thought that they knew her as the doctor told her that she would feel better if she worked part-time and lost some weight.  *Id*.

On December 2, 2014 Plaintiff presented to her nurse for medication management and was described as pleasant, controlled and cooperative.  Tr. at 437.  She indicated that her anxiety and depression were controlled and she denied hallucinations.  *Id*.  Nurse Forup found that Plaintiff's mood was irritable, she had appropriate affect, organized thought process, she was relaxed, had good eye contact and was cooperative, she had appropriate speech, intact memory, and adequate concentration.  *Id*.

On December 24, 2014, Plaintiff reported to Ms. Graff that she was stressed and had a headache.  Tr. at 439.  Ms. Graff found that Plaintiff was depressed and anxious, had a blunted affect, thought blocking, was passive but had good eye contact, she had appropriate speech and was calm, she had intact memory, and she admitted that she was having hallucinations.  *Id.*  She also admitted to passive suicidal ideation when she was having panic attacks.  *Id.*  Plaintiff was distracted at the session and reported that everything was a stressor.  *Id.*  She indicated that she needed a break from her children.  *Id*.

Plaintiff reported to Ms. Graff on January 21, 2015 that she was having trouble getting out of bed due to stress.  Tr. at 461.  She reported that she was overwhelmed due to the number of bad

-6-

things happening in her life, including her stepfather being in the hospital and her daughter and nephew being "jumped*." Id.*

Plaintiff also saw Dr. Kazmi on January 21, 2015 and she reported her stress level increased due to her stepfather's stroke and hospitalization. Tr. at 428. Dr. Kazmi found that Plaintiff was alert, with normal speech and psychomotor activity, sad mood, incongruent affect, intact memory, and he indicated that Plaintiff denied hallucinations or suicidal ideations. *Id.* He continued her medications and diagnosed major depressive disorder, recurrent, severe without psychotic features, anxiety disorder not otherwise specified, and post-traumatic stress disorder ("PTSD"). *Id.*

Ms. Graff had a session with Plaintiff on February 5, 2015 and Plaintiff reported that she was having feelings of being worthless. Tr. at 441. She admitted to hallucinations and Ms. Graff found Plaintiff's mood to be depressed and anxious, her affect blunted, she had thought blocking, was guarded and passive, had soft speech, intact memory, and adequate concentration. *Id.*

On March 3, 2015, Dr. Tishler, Ph.D., prepared a mental RFC for Plaintiff on behalf of the agency. Tr. at 111-112, 115-117, 125-126, 129-131. Upon reviewing the record, Dr. Tishler opined that Plaintiff was moderately restricted in daily living activities, social functioning and concentration, persistence or pace. *Id.* He found that Plaintiff could: interact occasionally and superficially and receive instructions and ask appropriate questions in a smaller or more solitary and less public to nonpublic work setting; she would do best in a more solitary and nonpublic work setting with no over the shoulder supervision; and she could cope with the ordinary routine changes in a work setting which was not fast-paced or had high production demands. *Id.*

In a therapy session on August 11, 2015, Plaintiff reported that her stressors were her children, her youngest children's father, and his mother. Tr. at 510. She indicated that she was "so stressed out" because she could not find a babysitter and her children were following her everywhere. *Id.* She reported increased hallucinations. *Id.* Ms. Graff found that Plaintiff's mood was depressed and anxious, her behavior was agitated, her thought process was blocked, she had intact memory, and she admitted to auditory and visual hallucinations*. Id.*

On September 28, 2015, Plaintiff presented for medication management with a nurse and she reported that she was compliant with her medications and her mood was stable with denials of

depression, anxiety and hallucinations. Tr. at 506. Nurse Klein found that Plaintiff's mood was stable, her affect was appropriate, she had organized thought process, good eye contact, intact memory, and she denied hallucinations, although she was easily distracted. *Id.*

Therapy notes dated October 13, 2015 indicate that Plaintiff presented with the stressors of a new puppy, her youngest children's father, and her children's paternal grandmother. Tr. at 504. Her children's father bought them a new puppy and Plaintiff was frustrated because she could not afford all of the costs associated with a puppy. *Id.*

Plaintiff presented to Ms. Graff on October 28, 2015 and reported that she was feeling isolated and not in the mood for her favorite holiday of Halloween. Tr. at 502. She was feeling increased depression and anxiety and indicated that when she was in the waiting room, but had increased anxiety thinking that people were watching and laughing at her. *Id.* Plaintiff reported that she had been working to understand her social security paperwork and she had no anxiety at her youngest daughter's birthday party. *Id.* Plaintiff also indicated that she was going to attempt to go to Cedar Point for Halloweekends or go to see the red pandas. *Id.* Ms. Graff noted that Plaintiff's mood was depressed and anxious, her affect was blunted, her behavior was pleasant, she had impaired memory and admitted hallucinations, but she had adequate concentration. *Id.*

Dr. Kazmi saw Plaintiff on October 30, 2015 for medication management and Plaintiff reported that she was doing OK on the medications and did not want them adjusted. Tr. at 501. She indicated that the medications benefitted her, but she did not like to be around people. *Id.* Dr. Kazmi found that Plaintiff was alert, with normal speech, a sad mood, incongruent affect, constricted range, intact memory, denial of suicidal ideation and denial of hallucinations. *Id.* He continued her medications. *Id.*

Plaintiff met with Ms. Graff for therapy on November 17, 2015 and Plaintiff reported that her stressors were her hernias because the pain made her want to die. Tr. at 499. She admitted to thinking about suicide due to her abdominal pain. *Id.* Ms. Graff found Plaintiff's mood to be depressed and anxious, her affect labile, her thought process circumstantial and racing, she was disheveled and restless, her memory was impaired, but she had adequate concentration. *Id.*

-8-

Plaintiff presented to Ms. Graff on December 14, 2015 and reported her stressors as her weight and the fact that her oldest daughter had moved to North Carolina. Tr. at 497. She admitted to auditory, command and visual hallucinations and increased suicidal ideation since her daughter moved. *Id*. Ms. Graff found Plaintiff's mood to be depressed and anxious, her affect appropriate to content, her thought process racing and circumstantial, and her memory impaired. *Id*.

Ms. Graff had a therapy session with Plaintiff on December 29, 2015 and Plaintiff reported that her stressor was the waiting room, her younger children, her oldest daughter, and a nursing home form. Tr. at 495. She admitted to increased command and visual hallucinations and Ms. Graff found Plaintiff's mood to be depressed and anxious, her affect blunted, her thought process circumstantial, her memory impaired and she had adequate concentration. *Id*.

Dr. Kazmi saw Plaintiff for medication management on January 19, 2016 and she reported that her medications needed adjusted because they were not working as good as before. Tr. at 493. She reported that she was applying for social security disability benefits a second time. *Id.* Dr. Kazmi found that Plaintiff was alert, with normal speech, a sad mood, incongruent affect, constricted range, intact memory, and fair insight and judgment. *Id.* He noted that Plaintiff denied visual, auditory or tactile hallucinations. *Id.* He adjusted her medications. *Id.*

A therapy note dated January 25, 2016 indicated that Plaintiff reported her stressors as "Same shit, different day; people wearing Jordans." Tr. at 491. Ms. Graff found that Plaintiff was depressed and anxious, her affect was blunted, her thought process was racing, she was passive, her speech was hesitant, her memory was intact and her concentration was adequate. *Id*. Plaintiff reported an increase in visual hallucinations. *Id.* She also indicated that she occasionally kept herself from going out because she was concerned that she would become irritable toward others. *Id.*

### B.    PHYSICAL HEALTH EVIDENCE

Plaintiff treated with Dr. Alanis on November 13, 2013, April 23, 2014, April 29, 2014, August 26, 2014, March 17, 2015, September 30, 2015, November 6, 2015, November 18, 2015, and March 9, 2016. Tr. at 514-519. Dr. Alanis' treatment notes are for the most part illegible. *Id.* Legible diagnoses at each visit included obesity. *Id*.

-9-

On November 13, 2014, Dr. Lakin examined Plaintiff on behalf of the agency.  Tr. at 421-423.  He noted that Plaintiff complained of chronic low back pain, bilateral ankle pain, and depression and anxiety.  *Id*. at 421.  Plaintiff told Dr. Lakin that the pain resulted from working in childcare for several years and from being morbidly obese.  *Id*.  He indicated that Plaintiff was taking

no pain medications and never had any surgeries or injections in her back.  *Id.*  Plaintiff reported that she could carry light groceries from the car into the house, she could not lift a small child, she could drive and walk from the car to inside of a shopping mall, and she could cook, bathe, do light shopping, and clean.  *Id*.  She stated that she could not sit through a movie, she could stand for 5-10 minutes before needing a break, and she could climb 5 stairs, and 20 stairs with difficulty.  *Id.*

Upon examination, Dr. Lakin found that Plaintiff was 64 inches in height and weighed 303 pounds.  Tr. at 422.  He noted that Plaintiff was alert and oriented, and comfortable and compliant, with no obvious psychiatric problems.  *Id.*  Dr. Lakin found that Plaintiff's range of motion in her cervical spine was normal, as well as the range of motion in her dorsolumbar spine and hips.  *Id*.  He noted no redness, swelling, joint enlargement, muscle wasting or anatomic deformities, no scoliosis, no spasms and a negative straight leg raising test.  *Id*.  He did note a mild 1+ edema in the bilateral ankles and normal strength in the ankles and upper extremities.  *Id*.  He found that Plaintiff had intact sensation and a normal gait, but she had difficulty in standing on one leg and in performing reciprocating heel-to-toe and tandem walking due to morbid obesity.  *Id.* at 423.

Dr. Lakin diagnosed Plaintiff with chronic low back and bilateral ankle pain, anxiety/depression, and morbid obesity.  Tr. at 423.  He opined that Plaintiff could lift and carry 5-10 pounds frequently up to six hours per day, she could lift and carry 11-20 pounds occasionally up to two hours per day, and she could rarely lift and carry greater than 20 pounds.  *Id*.  Dr. Lakin further opined that Plaintiff could sit continuously more than 6 hours per day and stand and walk occasionally 2 hours per day with regular breaks.  *Id.*

On November 20, 2014, agency consulting physician Dr. Lehv completed a physical residual functional capacity ("RFC") for Plaintiff, opining that she could: frequently lift and carry up to 10 pounds; occasionally lift and carry up to 20 pounds; sit, stand/walk up to 6 hours per 8-hour

workday; push/pull in an unlimited capacity; frequently balance, kneel, crawl and climb ramps/stairs; never climb ladders, ropes or scaffolds; occasionally stoop and crouch; and avoid all exposure to hazards. Tr. at 82-83.

On March 7, 2015, Dr. Villanueva, an agency consulting physician, reviewed Plaintiff's file and completed a RFC opining that Plaintiff could: occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; sit and stand up to 6 hours in an 8-hour workday; push/pull in an unlimited capacity; frequently climb ramps/stairs; never climb ladders, ropes and scaffolds; frequently balance and kneel; occasionally stoop and crouch; and avoid all exposure to hazards. Tr. at 128-129.

On October 15, 2015, Plaintiff underwent an evaluation in order to undergo bariatric surgery. Tr. at 542. Plaintiff reported a pain level of 0 out of 10, she had no barriers to learning, and had an excellent quality of life/health status. *Id.* at 540. She indicated that she walked every other day, she took no medications, she had no musculoskeletal problems, and no psychiatric problems, but she did have sinus issues. *Id.* at 548. Her seated and standing posture were within normal limits. *Id.* at 541. Her ranges of motion were all within normal limits and she had no gait deviations. *Id.* at 541-542. A physical examination of her musculoskeletal system was deemed normal and a steady gait was noted. *Id.* at 549. An upper gastrointestinal scope showed no large hiatal hernia, but a tiny sliding hiatal hernia. *Id.* at 545. She was diagnosed with morbid obesity, hypertension, hyperlipidemia, back pain, and depression. *Id.* at 549. She was qualified for surgery. *Id.*

On November 9, 2015, Plaintiff underwent a bariatric gastric bypass. Tr. at 516. Her preoperative diagnoses were morbid obesity, hypertension, back pain, probable sleep apnea and abnormal liver enzymes. *Id.* Her postoperative diagnoses were morbid obesity, hypertension, back pain, probable sleep apnea, abnormal liver enzymes, and incisional hernias. *Id.*

On March 21, 2016, Dr. Alanis completed a RFC assessment form as to Plaintiff's limitations as on or before December 31, 2014. Tr. at 522-526. He indicated that he examined Plaintiff every 3-4 months and her symptoms were that she was overweight, felt depressed, was stressed, had no energy, was unable to sleep, cried all of the time, had no desire to talk and isolated herself, loud sounds bothered her, and she had back and leg pain which worsened when she was

-11-

stressed. *Id*. at 522. He diagnosed her with obesity, major depressive disorder, anxiety disorder, agoraphobia, acrophobia, arachnophobia, ophiodophobia, hypertension, and back pain. *Id*.

Dr. Alanis opined that Plaintiff could stand and walk each up to 1 hour frequently for 1 hour each total each 8-hour workday and he made no indication of a restriction on her ability to sit. Tr. at 523. He indicated that Plaintiff could not complete an 8-hour day on a sustained, routine basis because of her obesity, something that was illegible, having no energy, insomnia and depression, and her frequent leg and back pain. *Id*. at 524. He opined that Plaintiff could occasionally lift and carry up to 10 pounds, and never lift more. *Id*. at 524-525. He indicated that Plaintiff could not perform pushing and pulling of arm or leg controls or perform fine manipulation. *Id*. He opined that she could occasionally bend, squat and reach, but she could never crawl or climb. *Id*. He opined that she was totally restricted from unprotected heights, moving machinery and driving automotive equipment, and she could have moderate exposure to changes in temperature and humidity and in exposure to dust, fumes and gases. *Id*. at 526.

### C.     TESTIMONIAL EVIDENCE

At the ALJ hearing held on March 24, 2016, Plaintiff's counsel conceded that her case was mainly a mental health case rather than a physical health case. Tr. at 37. Plaintiff testified that she lived with her three year-old and six year-old children, has a driver's license, and drives regularly to take her child to school. *Id*. at 39-41. She reported that she last worked in 2009 as a teacher's aide taking care of two and three year-olds and had prior work selling windshields at an automotive glass company in 2005. *Id*. at 41-42. Plaintiff indicated that she was not inclined to work after she gave birth because her "body wasn't functioning, the depression and anxiety kicked in." *Id*. at 44. She explained that she was depressed because she was not married and had no help from family during that time. *Id*. She stated that she sought treatment three or four years later and had been treating with Unison ever since. *Id*. at 44-45. She indicated that she was feeling better with counseling and medication. *Id*. at 45.

Plaintiff testified that she had panic attacks every couple of days and they are triggered by going to pick her son up from school because she has to be around a lot of people and thinks that they are looking and staring at her. Tr. at 47. She also reported that she had depression and PTSD.

-12-

*Id.* at 48.  When asked what her PTSD stemmed from, Plaintiff answered, "I think from having my children." *Id.*  When prompted further, Plaintiff answered that incidents in her past caused the symptoms.  *Id*. at 48-49.

Upon questioning by her attorney, Plaintiff indicated that she heard voices once a week or once a month that told her to hurt other people and she sometimes had thoughts of hurting herself. Tr. at 51-52.  She reported that her medications help the voices.  *Id*. at 52.  Plaintiff testified that she does not go anywhere very often and she does not go for walks.  *Id*.  She reported that she has one friend and that friend is always working.  *Id.* She indicated that she cannot be around groups of six people or more.  *Id*. at 53.

Plaintiff also testified that she sees Dr. Alanis, her primary care doctor, but only if she is sick or needs a follow-up.  Tr. at 53.  She indicated that she has not been treated by any doctor for arthritis, or her back and foot problems.  *Id*. at 54.  She reported that her ankle pain was better since her gastric bypass, but she thought that her back pain was worse.  *Id*. at 55.  She indicated that her energy level was also worse since the gastric bypass and she goes every two weeks to get B12 shots. *Id*. at 56-57.  She stated that she has problems sleeping and has nightmares, for which she takes medication.  *Id*. at 57-58.  Plaintiff also testified that she completed the twelfth grade, but was in special education classes.  *Id*. at 59.  She can bathe herself, change her clothes, vacuum, do dishes, cook, use a measuring cup, care for her children, and do the laundry.  *Id*. at 60-62.  Plaintiff testified that her back stiffens if she sits or stands too long, but she can take a walk if it hurts.  *Id.* at 63. She estimated that she could lift 20-30 pounds, she can bend, and she can climb stairs.  *Id*. at 63-65. She told the ALJ that mentally she is "not together" and even though she looked together, she was not.  *Id*. at 65.

The VE then testified.  Tr. at 66.  The ALJ asked him to assume a hypothetical individual who could perform light work except she could: frequently climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance, kneel and crawl; occasionally stoop and crouch; never be exposed to unprotected heights, dangerous moving mechanical parts, work with hazardous equipment, or operate a motor vehicle; not be exposed to uneven terrain; was limited to performing simple, routine, repetitive tasks not at a production-rate pace; use her judgment for only work-related

-13-

decisions; and have occasional contact with supervisors and co-workers and no contact with the public.  *Id*. at 66-67.  When asked if this hypothetical person could perform Plaintiff's past relevant work, the VE responded no.  *Id*. at 67.

The ALJ asked if such a hypothetical person could perform any other jobs, and the VE responded that inspection jobs, sorting jobs and packaging jobs could be performed, all of which existed in significant numbers in the economy.  Tr. at 67-68.

The ALJ modified the hypothetical individual, restricting the exertional level to sedentary, and the VE responded that such a hypothetical person could perform a significant number of jobs existing in the economy, including inspection and hand work jobs such as sealer, polisher, and smoother.  Tr. at 68.

Plaintiff's attorney asked the VE if adding a restriction that Plaintiff could have no proximity to more than six co-workers would impact job availability, and the VE responded that it would.  Tr. at 71.  He explained that it would have a significant impact as only 20% of the numbers would remain.  *Id.*  When Plaintiff's counsel asked if an additional restriction that the claimant should not be in visual contact with co-workers due to hallucinations and visual disturbances, the VE indicated that the jobs he identified would not be available for the hypothetical person.  *Id*. at 72.  He also indicated that the jobs he identified would not be available if the hypothetical person had anxiety attacks and unscheduled breaks at a rate lasting more than six minutes per hour.  *Id.* at 73.

### III.    RELEVANT PORTIONS OF ALJ'S DECISION

On June 2, 2016, the ALJ issued a decision finding that Plaintiff had not engaged in substantial gainful activity since November 12, 2013, the alleged onset date, and he found that since that date, Plaintiff had the severe impairments of obesity, major depressive disorder, anxiety disorder, and PTSD.  Tr. at 16.  The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1.  *Id.* at 17-19.  After considering the record, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations: frequently climbing stairs and ramps; never climbing ladders, ropes or scaffolds; frequently balancing, kneeling, and crawling; occasionally stooping  and crouching; never being exposed to

-14-

unprotected heights, dangerous moving mechanical parts, working with hazardous equipment, operating a motor vehicles, or being exposed to uneven terrain; simple, routine, and repetitive tasks but not at a production rate pace; using judgment for work-related decisions; occasional contacts with supervisors and co-workers; and no contact with the public. *Id.* at 19.

Based upon Plaintiff's age, education, work experience, the RFC, and the VE's testimony, the ALJ determined that Plaintiff could not perform any past relevant work, but she could perform jobs existing in significant numbers in the national economy, such as inspector, sorter, or a packager. Tr. at 24-25.  In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and she was not entitled to DIB or SSI from November 12, 2013, through the date of his decision. *Id.* at 25.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

-15-

## V.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6ᵗʰ Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.  LAW AND ANALYSIS

The undersigned reviews Plaintiff's assertions of error out of the order in which she presents them.

### A.  STEP TWO IMPAIRMENTS

Plaintiff asserts that the ALJ did not properly review her history of incisional hernias, back pain, ankle pain, sleep apnea, hypertension and a learning disability at Step Two of his sequential analysis and he failed to consider these conditions in combination with her morbid obesity in the rest

-16-

of his sequential analysis, including in his RFC and the hypothetical individual that he presented to the VE. ECF Dkt. #16 at 16-18. For the following reasons, the undersigned recommends that the Court find no merit to Plaintiff's assertion.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." § 404.1521(a). Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. *See* 20 C.F.R. § 404.1520(d).

Plaintiff is correct that the ALJ did not identify or address Plaintiff's incisional hernias, back and ankle pain, sleep apnea, hypertension, or learning disability in his Step Two analysis. However, it is Plaintiff's burden to establish medically determinable impairments that are severe at Step Two and Plaintiff has not met her burden in this case as to those conditions. She points to no medical records establishing that these conditions were medically determinable impairments, that they were impairments for which she received treatment, or that they were impairments that meet the required severity under Step Two.

Plaintiff cites to agency reviewing physician Dr. Lehv's RFC assessment in which he reviewed Plaintiff's complaints of back and ankle pain under Listing 1.04 of the Listing of Impairments for spine disorders. ECF Dkt. #16 at 17. While Dr. Lehv did review Plaintiff's back and ankle pain under this Listing, he noted that no objective impairments were found on Dr. Lakin's November 2014 consultative examination "other than joint limitations due to body habitus." Tr. at 82. He noted that Plaintiff could complete most of her daily living activities and can drive, but he did provide limited light work limitations based upon Plaintiff's physical complaints due to her obesity. *Id.* The fact that an agency reviewing physician reviewed Plaintiff's back and ankle

-17-

complaints under Listing 1.04 does not establish that the ALJ must find that they were medically determinable impairment that are severe at Step Two. Moreover, the ALJ nevertheless adopted a limited light work level for Plaintiff. Accordingly, the undersigned recommends that the ALJ did not err by failing to find that Plaintiff's incisional hernias, back and ankle pain, sleep apnea, hypertension and learning disability were not medically determinable severe impairments.

Alternatively, the ALJ's failure to identify these conditions at Step Two, even if they were medically determinable and severe, is harmless error because he did list Plaintiff's obesity, major depressive disorder, anxiety disorder, and PTSD as severe impairments. Tr. at 16-17. An ALJ's failure to include an impairment as severe at Step Two is not reversible error where the ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process as the ALJ could still properly consider the non-included impairment in determining a claimant's RFC. *See Maziarz*, 837 F.2d at 244 (Commissioner's failure to find claimant's cervical condition severe not reversible error since the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process). Thus, any error in failing to identify the other conditions as severe impairments at Step Two is harmless error since the ALJ identified other impairments as severe and he proceeded onward in the sequential analysis.

Further, although the ALJ did not directly mention Plaintiff's back and ankle pain at further steps in the sequential evaluation, he did afford great weight to the opinion of agency examining physician Dr. Lakin, who examined Plaintiff in November 2014. Tr. at 20-23, citing Tr. at 421-423. The ALJ noted Dr. Lakin's report that Plaintiff complained of chronic low back pain and ankle pain, but Dr. Lakin indicated that Plaintiff told him that she attributed these pains to her obesity and prior work in childcare. Tr. at 21, citing Tr. at 421. Dr. Lakin's physical examination showed that Plaintiff had normal ranges of motion in the spine and ankles, with no muscle spasms or redness, swelling, joint enlargement, anatomical deformity, or muscle wasting. *Id*. at 422. Dr. Lakin also found that Plaintiff had normal extremity strength, no motor aphasia, intact sensation, and a normal gait, with problems heel to toe tandem walking and standing on one leg due to morbid obesity. *Id*. at 423. Thus, while he did not mention the back pain and ankle pain, the ALJ reviewed, accepted and attributed great weight to Dr. Lakin's opinion that Plaintiff could perform limited light work

-18-

with chronic low back and bilateral ankle pain, anxiety/depression, and morbid obesity. *Id*. at 21-22, citing Tr. at 421-423.

The ALJ also cited to Plaintiff's reports to Dr. Lakin that she could cook, bathe, dress herself, perform light shopping and cleaning, she could carry light groceries, drive a car, and walk from a car to the mall.  Tr. at 17, citing Tr. at 421-423.  The ALJ considered these activities and conducted a pain analysis under the proper Social Security regulations and Rulings, discounting Plaintiff's complaints of severe pain based upon her reports of the above daily activities and reported activities that she went to a minor league baseball with her children, she went to Cedar Point and a trunk or treat with her children, she planned to go to the zoo, she took no medications, she drove, and she was able to care for her small children without assistance.  *Id*. at 19-24.

For these reasons, the undersigned recommends that the ALJ committed no error at Step Two because substantial evidence supports his Step Two determination and Plaintiff failed to establish that her conditions of incisional hernias, back and ankle pain, sleep apnea, hypetension, and learning disability were medically determinable impairments that met the required severity of Step Two. Should the Court find that Plaintiff did meet her burden of establishing that these conditions were medically determinable and severe, the undersigned alternatively recommends that the Court find that the ALJ's error was harmless because he found that Plaintiff had other severe impairments and indirectly considered Plaintiff's complained-of conditions at subsequent steps in the sequential evaluation, when he attributed great weight to the opinions of Dr. Lehv and Dr. Lakin and determined a limited light work exertional level for Plaintiff.

### B.      OBESITY

Plaintiff also asserts that the ALJ failed to list any physical impairment besides her obesity at Step Three and therefore it is unknown which impairments led the ALJ to reduce her physical RFC to limited light exertional work.  ECF Dkt. #16 at 17-18.  She also contends that the ALJ failed to connect her obesity with his limited light exertional level for her.  *Id*. at 18.

The undersigned recommends that the Court find no merit to Plaintiff's assertions.  An ALJ is not required to address and review every possible impairment of a claimant that could fall under the Listing of Impairments at Step Three.  "[N]either the listings nor the Sixth Circuit require the

-19-

ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014)(quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x 639, 641 (6th Cir. 2013).  An ALJ must consider and address "a relevant listing when the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing."  *Id.*, quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990).  A claimant "must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing" in order to raise the "substantial question" necessary to qualify as disabled under the listing.  *Id.*  If no such specific evidence is presented, an ALJ does not commit reversible error by failing to evaluate a listing at Step Three.  *Id.*

Listing 1.04 was considered by Dr. Lehv in his agency reviewing assessment, but not specifically identified by the ALJ in Step Three of his decision.  Plaintiff complains that the ALJ should have reviewed this Listing at Step Three since Dr. Lehv reviewed this Listing in his assessment.  This Listing at the time of Plaintiff's filing of her disability application required the following:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04 of Listing of Impairments, 20 C.F.R. Part 404, Subpart B, eff. 2-26-14 to 12/8/14.

-20-

Dr. Lehv identified Listing 1.04, but determined in his medical analysis that Plaintiff had no significant objective impairments on her consultative examination with Dr. Lakin other than joint limitations due to her body habitus.  Tr. at 82.  Dr. Lehv nevertheless limited Plaintiff's exertional level based upon her complaints of obesity-related back and ankle pain.  *Id.*  No objective medical evidence demonstrated that Plaintiff's back pain met or equaled the requirements of Listing 1.04.  Accordingly, Plaintiff has failed to raise a "substantial question" necessary to qualify as disabled under the listing and thus the ALJ did not commit reversible error by failing to evaluate this listing at Step Three.  *Id.*

Further, the ALJ in this case did consider Plaintiff's obesity, specifically finding that it was a severe impairment at Step Two and indicating at Step Three that he considered Plaintiff's obesity and its impact on increasing the effects of Plaintiff's other impairments.  Tr. at 16-17.  The ALJ further noted Plaintiff back and ankle complaints to Dr. Lakin at the consultative examination and her statement that these complaints were due to her being morbidly obese.  *Id.* at 21.  The ALJ noted Plaintiff's obesity with a BMI of 52, that she did not take pain medications, and she was able to take her children to a trunk or treat, to see a minor league baseball game, and she was able to drive and care for her young children on her own as a single parent.  *Id.* at 21-22.  He also afforded great weight to the opinions of Drs. Lehv and Lakin, who specifically considered Plaintiff's obesity and limited her accordingly.  *Id.* at 21-23.

Since the ALJ specifically addressed Plaintiff's obesity in Steps Two, Three and Four, the undersigned recommends that the Court find that no merit to Plaintiff's assertions of ALJ error alleging that he did not address her obesity or her back pain under Listing 1.04.

### C.     **PHYSICAL RFC**

Plaintiff also challenges the ALJ's physical RFC for her, asserting that because the ALJ failed to list any severe physical impairment besides obesity in his decision, there was "ambiguity as to what impairments have led to [sic] ALJ reducing physical RFC to less than a full range of light exertion."  ECF Dkt. #16 at 17.  For the following reasons, the undersigned recommends that the Court find that Plaintiff is incorrect as the ALJ set forth a physical RFC and adequately explained his reasons for the limited light exertional level and substantial evidence supports this RFC.

-21-

A claimant's RFC is an assessment of the most that a claimant "can still do despite [her] limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3).  The claimant bears the responsibility of providing the evidence used to make a RFC finding.  20 C.F.R. §§ 416.945(a)(3).  However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5.  Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases.  SSR 96-8p.  The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis.  *Id.*  Further, it states that the RFC assessment must be based on *all* of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations.  *Id.*

Opinions from agency medical sources are considered opinion evidence. 20 C.F.R. § 416.927(f). The regulations require that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii).  More weight is generally attributed to examining medical source opinions than on non-examining medical source opinions.  *See* 20 C.F.R. § 416.927(d)(1).  The Sixth Circuit has held that the social security regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one examining physician's opinion over another. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 508 (6th Cir. 2006).

Moreover, while an ALJ is not required to discuss each and every piece of evidence in the record to justify his or her determination, *see, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx.

-22-

661, 665 (6th Cir. 2004), when the opinion of a medical source contradicts the ALJ's limitations in the claimant's RFC, the ALJ "'must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.'" *Wolfe v. Colvin*, No. 4:15CV1819, 2016 WL 2736179, quoting *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D. Ohio 2011). Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

In determining Plaintiff's physical RFC in the instant case, the ALJ considered both the severe and nonsevere impairments of Plaintiff in determining her RFC. He explained that he considered her obesity and complaints of pain and limitations relating thereto, and he partially discounted her assertions of disabling pain due to her reports of activities inconsistent with severe pain. Tr. at 19-24. The ALJ reviewed Plaintiff's testimony and reports to her mental health professionals that she did not take pain medication and she could care for herself and her two small children as a single parent, she could drive, cook, do the laundry, use the stairs, perform light shopping and cleaning, walk from her car to the mall, and she took her children to a minor league baseball game, trunk or treating, and she planned to take them to Cedar Point or the zoo. Tr. at 20, 22-33, citing Tr. at 17, 20-23, 40, 60-62, 368, 421, 445, 455, 504, 508. The ALJ also reviewed the opinion evidence of record, attributing little weight to the opinion of Plaintiff's treating physician, Dr. Alanis, who opined, among other things, that Plaintiff could never lift or carry more than 10 pounds and could stand/walk only 1 hour each per 8-hour workday. Tr. at 22-23. Dr. Alanis did not offer an opinion as to Plaintiff's ability to sit. The ALJ found this opinion inconsistent with the medical record as a whole, which included no diagnostic testing or abnormal test results and normal examination findings by agency examining physician Dr. Lakin, who found that Plaintiff had normal ranges of motion, intact sensation, no spasms, normal extremities, and no significant objective impairments other than joint limitations due to her morbid obesity. Tr. at 82. The ALJ also relied upon the findings of the agency reviewing physicians, who opined a limited light work level for

-23-

Plaintiff based upon a lack of objective medical findings establishing severe physical impairments besides obesity.

Plaintiff asserts that the ALJ violated the treating physician rule by distorting Dr. Alanis' opinion, by failing to explain how or why Dr. Alanis' opinion regarding Plaintiff's standing and walking abilities, and by generically stating that the medical record as a whole was inconsistent with and unsupported of said abilities.  ECF Dkt. #16 at 22-24.  For the following reasons, the undersigned recommends that the Court find that the ALJ provided good reasons for his treatment of Dr. Alanis' opinion and substantial evidence supports that determination.

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons"[3] for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

---

[3]  The Court notes that the SSA has changed the treating physician rule effective March 27, 2017.  *See* 20 C.F.R. § 416.920.  The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions.  Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules  and will consider the supportability and consistency factors as the most important factors.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

In his decision, the ALJ addressed Dr. Alanis' opinion in a short paragraph. Tr. at 22-23. He stated Dr. Alanis' opinion that Plaintiff could never lift or carry more than 10 pounds and she "could stand or walk for one hour in an eight-hour day, could not crawl or climb, and was totally restricted from unprotected [h]eights, moving machinery, and driving automotive equipment." *Id.* at 22. The ALJ explained that he gave little weight to Dr. Alanis' opinion because it was inconsistent with the medical record as a whole, was unsupported by the medical record, and it contrasted sharply with other opinions of record. *Id.*

Plaintiff is correct that the ALJ misstated Dr. Alanis' opinion as to her ability to stand and walk. The ALJ indicated that Plaintiff could "stand or walk for one hour in an eight-hour day." Tr. at 22. However, Dr. Alanis actually opined that Plaintiff could stand for 1 hour total at one time per 8-hour workday and she could walk for 1 hour total at one time per 8-hour workday. Tr. at 22, 523. While there is a difference, Plaintiff fails to explain how this had any material impact on the ALJ's physical RFC for Plaintiff or on his decision to attribute little weight to Dr. Alanis' opinion.

-25-

Moreover, the ALJ provided sufficiently good reasons for discounting Dr. Alanis' opinion, although they must be gleaned from other parts of the record for detail.  In affording less than controlling and only little weight to Dr. Alanis' opinion, the ALJ stated that the opinion was inconsistent with and unsupported by the medical evidence of record.  While somewhat generic, the only legible examination findings in the record concerning Plaintiff's back and ankle pain are those made by Dr. Lakin, who found no significant abnormalities concerning Plaintiff's physical conditions besides her obesity.  Tr. at 21, citing Tr. at 421-427, 512-519, 522-526.  Plaintiff reported physical pain to Dr. Lakin, but she attributed it to her obesity, she indicated that she did not take any pain medications,  and she had not undergone any testing or major treatment for said conditions.  In the very few legible parts of his opinion, Dr. Alanis did not provide any objective findings or diagnostic testing concerning Plaintiff's back or ankle pain beyond her own subjective reports.  Tr. at 421-427, 512-519, 522-526.  Moreover, the ALJ noted Plaintiff's reports that she could perform light cooking and cleaning, she did laundry, she used the stairs and drove a car, she cared for her two minor children as a single parent, and she took her children trunk or treating and to a minor league baseball game.  *Id*. at 21, 23. Since the ALJ adequately explained and provided sufficiently good reasons for attributing less than controlling weight and little weight to Dr. Alanis' opinion, he was not required to adopt Dr. Alanis' limitations.

As to the opinions of the agency examining and reviewing physicians, Drs. Lakin and Lehv, the ALJ was not required to provide good reasons for the weight that he attributed to those opinions.  *Kornecky*, 167 Fed.Appx. at 508.  However, SSR 96-8p provides that, when determining the RFC assessment, an ALJ "must always consider and address medical source opinions [and] [i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96–8p, 1996 WL 374184 at *7.

The ALJ specifically addressed the agency physicians' opinions in this case and indicated, among other things, that Dr. Lakin opined that Plaintiff could stand and walk 2 hours per 8-workday and Dr. Lehv opined that Plaintiff could stand or walk for 6 hours of an 8-hour workday.  Tr. at 22-23.  Plaintiff complains that the ALJ failed to explain how he attributed great weight to both of these opinions when they differed as to the standing and walking limitations, with Dr. Lakin opining a 2-

-26-

hour stand/walk limitation and Dr. Lehv opining a 6-hour stand/walk limitation.  ECF Dkt. #16 at 24.  It is true that the ALJ did not adopt Dr. Lakin's 2-hour stand/walk limitation.  Tr. at 19.  However, the ALJ did consider the sedentary exertional level of work as evidenced in the hearing transcript when he presented to the VE a hypothetical individual with a RFC that included the limitation to sedentary level work.  *Id*. at 68.  The ALJ also asked Plaintiff at the hearing if she had any diagnostic testing on her back or ankles, and she responded that she had not.  *Id*. at 63.  She indicated that she had trouble standing because her right hip wanted to give out, but she acknowledged that she had no testing or treatment on her hip.  *Id*.  Further, an ALJ is not required to adopt every facet of an opinion when he attributes it great weight.  *Taylor v. Colvin,* No. 1:13CV222, 2013 WL 6162527 (N.D. Ohio Nov. 22, 2013)(ALJ is not required to adopt every opinion of a medical expert even though he attributed opinion great weight); *White v. Comm'r of Soc. Sec.*, 970 F.Supp.2d 733, 753-754 (N.D. Ohio 2013)(fact that ALJ did not incorporate all of agency physician's restrictions was not legal error in and of itself even though ALJ afforded significant weight to the opinion); *Smith v. Comm'r of Soc. Sec.*, No. 5:11CV2104, 2013 WL 1150133, at *11 (N.D. Ohio Mar. 19, 2013)("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely does not adopt from a non-examining physician's opinion, even when it is given great weight.").  Moreover, the ALJ's initial review of Dr. Lakin's opinion provides insight into his reason for not adopting the limitation as he noted that Dr. Lakin indicated that Plaintiff attributed her back and ankle pain to working in childcare and to her morbid obesity, and Plaintiff took no pain medications and required no surgeries or injections to her back.  Tr. at 21.  He further noted that Plaintiff reported being able to cook, care for herself and two minor children on her own as a single parent, she could drive and do light shopping and cleaning, and she was able to walk from her car to a mall. *Id*.

For these reasons, the undersigned recommends that the Court find that substantial evidence supports the ALJ's decision to attribute less than controlling weight to Dr. Alanis' opinion and for not adopting Dr. Lakin's standing/walking limitation into his RFC for Plaintiff despite giving that opinion great weight.

-27-

### D.    MENTAL RFC

Plaintiff also asserts that the ALJ's mental RFC for her was inadequate and the hypothetical individuals that he presented to the VE did not adequately account for her history of hallucinations, problems with irritability, lack of focus, panic attacks, agoraphobia, and limited intelligence.  ECF Dkt. #16 at 10-16.  For the following reasons, the undersigned recommends that the Court find that substantial evidence supports the ALJ's mental RFC for Plaintiff and the hypothetical individuals that he presented to the VE.

In his decision, the ALJ found that Plaintiff's major depressive disorder, anxiety disorder, and PTSD were severe impairments.  Tr. at 16.  He specifically reviewed Plaintiff's impairments under Listing 12.04 for affective disorders and under Listing 12.06 for anxiety disorders.  *Id*. at 17-19.  He also reviewed the medical records, which included counseling sessions at Unison and medication management visits with treating psychiatrist, Dr. Kazmi.  *Id*.  The ALJ also reviewed Plaintiff's reports of her daily living activities and he determined a mental RFC limiting her to simple, routine and repetitive tasks that did not require a production-rate pace, required only work-related decision-making, occasional contact with supervisors and co-workers, and no contact with the public.  *Id.* at 19.

The undersigned notes that the medical record does not contain an opinion or mental RFC assessment by Dr. Kazmi or any other mental health treatment professional of Plaintiff.  Moreover, upon initial evaluation, a counselor diagnosed Plaintiff with severe major recurrent depressive disorder without psychotic features, and anxiety disorder not otherwise specified. Tr. at 300.  In his initial psychiatric evaluation, Dr. Kazmi diagnosed Plaintiff with major recurrent depressive disorder, and he assigned her a GAF of 55, indicative of moderate symptoms.  *Id.* at 302.

Regarding Plaintiff's hallucinations, medical records indicate that Plaintiff denied having hallucinations to Dr. Kazmi and to a counselor at her initial evaluations.  Tr. at 309-310, 325.  She reported that she saw shadows on and off for the past five years when she lived at her previous residence, but she had not seen shadows since she moved.  *Id.* at 343-344, 346.  Plaintiff also repeatedly denied having hallucinations at all of her examination and medication management visits with Dr. Kazmi.  Tr. at 313, 349, 351, 428, 429, 430, 493-494, 501.  And Dr. Kazmi's mental status

-28-

examinations routinely showed that Plaintiff was oriented and cooperative, had an intact memory, normal speech, fair insight and judgment, and adequate concentration.  *Id.*

Plaintiff did report hallucinations to her counselor and medication management nurse on numerous occasions, but she also denied hallucinations on numerous occasions.  Tr. at 309-310, 327, 330, 332, 332-334, 335-337, 338, 339, 357, 362-363, 364-365, 366-367, 368-369, 371-372-373, 374-375, 376-377, 379-389, 400-401, 409-410.  Further, Plaintiff admitted hallucinations when she did not take her medications as prescribed or she had forgotten to take them.  *Id.*  Sometimes, Plaintiff admitted to hallucinations and denied hallucinations on the same dates.  For instance, Plaintiff admitted to her medication assessment nurse on February 28, 2014 that she saw shadows at night and they scared her.  *Id.* at 405-406.  She denied auditory hallucinations and reported that she was compliant with her medications "most of the time."  Tr. at 405-406.  However, Plaintiff denied hallucinations at her February 28, 2014 session with her counselor.  *Id.* at 356-357.  Plaintiff also admitted occasional auditory hallucinations to her medication management nurse on May 28, 2014, but also indicated that she does not take her medication regularly because she forgets.  *Id.* at 407.  Plaintiff then denied having hallucinations when she met with her counselor on the same day of May 28, 2014.  *Id.* at 368.  Plaintiff admitted to her counselor on June 11, 2014 that she was having visual hallucinations of people laughing at her and she once saw the devil and heard a male voice talking to her in the past.  *Id.* at 358.  However, Plaintiff denied having current hallucinations when she met with her nurse on the same date and she indicated that she had not started the Buspar that had been prescribed to her at her last visit.  *Id.* at 409.  Plaintiff also admitted having hallucinations when she presented for counseling on August 13, 2014 and a nursing assessment on August 20, 2014, and she explained on August 20, 2014 that the hallucinations were less frequent when she was taking her medications, even though the nurse noted that Plaintiff was not on any antipsychotic medications.  *Id.* at 431.

Plaintiff admitted hallucinations on October 1, 2014, October 14, 2014 and October 29, 2014 to her counselor.  Tr. at 457, 459, 467.  She thereafter denied hallucinations at her November 4, 2014 nursing assessment and she indicated that she had been taking her medications only three times per week because she was still breastfeeding her two year-old daughter.  Tr. at 433.  She also admitted

to her nurse on November 11, 2014 that she was not taking her medications as prescribed. *Id.* at 435. She told her counselor on November 11, 2014 that she was not motivated to take her medications and she was having hallucinations. *Id.* at 443. At her counseling session on November 26, 2014, Plaintiff admitted to having increasing hallucinations, suicidal ideations, and "spur of the moment" plans to hurt others. *Id.* at 449. She stated that she had increased agitation and frustration since she saw the social security doctor and she was offended when he told her that she would feel better if she lost weight and worked part-time. *Id.*

On December 2, 2014, Plaintiff presented to her nurse and was described as pleasant, controlled and cooperative. Tr. at 437. Plaintiff's anxiety and depression were controlled and she denied hallucinations. *Id.* On December 24, 2014, Plaintiff admitted having hallucinations to her counselor and she reported her stressors were "everything" and she was having passive suicidal ideations, increased panic attacks and depression. *Id.* at 439. Plaintiff admitted to increased depression and hallucinations because her stepfather was dying. *Id.* at 451. She also admitted to hallucinations on January 21, 2015 as well and reported feeling overwhelmed and stressed due to the bad events occurring in her life, including her stepfather's situation and her older daughter and nephew being "jumped." *Id.* at 431.

On September 28, 2015, Plaintiff reported to her nurse that she was compliant with her medications. Tr. at 506. She indicated that her mood was stable, and she denied depression, anxiety, and hallucinations. *Id.* On October 13, 2015, Plaintiff admitted to her counselor that she was having hallucinations. *Id.* at 504. On October 28, 2015, Plaintiff indicated to her counselor that she felt isolated and was having hallucinations and increased anxiety and depression. *Id.* at 502.

Yet on October 30, 2015, Plaintiff presented to Dr. Kazmi for medication management and reported that she was doing "OK" on her medications and she did not want them changed. *Id.* at 501. She indicated that she was benefitting from therapy and medications. *Id.* Dr. Kazmi found that Plaintiff was cooperative and alert, had normal speech, a sad mood, incongruent affect, intact memory, and she denied hallucinations. *Id.* Dr. Kazmi found Plaintiff's insight and judgment to be fair and he diagnosed Plaintiff with major recurrent depressive disorder with episodic psychotic features, PTSD, and unspecified anxiety disorder. *Id.*

-30-

Plaintiff admitted to her counselor on November 17, 2015 that she was having suicidal thoughts due to abdominal pain caused by her hernias and she had increased depression and hallucinations. Tr. at 499. On December 14, 2015, she admitted to increased ideation since her daughter moved to North Carolina and she admitted to hallucinations as well. *Id*. at 497. She also admitted to increased command and visual hallucinations on December 29, 2015. *Id*. at 495. Plaintiff was told to speak with her psychiatrist about the hallucinations at her next visit. *Id*.

Yet on January 19, 2016, Plaintiff denied hallucinations when she presented to Dr. Kazmi. Tr. at 493. She did report that she was frustrated and her medications needed adjustment because they were not working as well as before. *Id*. at 493. Dr. Kazmi found that Plaintiff was alert and oriented, had normal speech, a sad mood, incongruent affect, an intact memory, and she denied delusions, hallucinations, and suicidal or homicidal ideations. *Id*. He rated her insight and judgment as fair and diagnosed her with major recurrent depressive disorder, with psychotic features, PTSD, and unspecified anxiety disorder. *Id.* He adjusted her medications. *Id*.

However, on January 25, 2016, progress notes indicate that Plaintiff reported to her counselor that she was having increased visual hallucinations and she continued to be depressed, anxious and irritable. Tr. at 491.

The medical records present varying views as to Plaintiff's hallucinations, with her reporting hallucinations and denying hallucinations sometimes on the same day, and at times she admitted that she was not taking her medications or not taking them as prescribed, and at other times she was compliant with her medications. In any event, Plaintiff consistently denied having hallucinations when asked by her treating psychiatrist. Further, no reports or records address the impact, if any, that the hallucinations had on Plaintiff's work-related abilities.

Plaintiff contends that her hallucinations and irritability do not fit with an ability to work with the public. ECF Dkt. #16 at 12. However, the ALJ's RFC for Plaintiff included a limitation of no contact with the public. Tr. at 19. Plaintiff also asserts that Plaintiff's hallucinations may be distracting to co-workers and may present a risk since she hears voices telling her to hurt people. ECF Dkt. #16 at 12. However, the ALJ limited Plaintiff to only occasional contact with co-workers and supervisors. Tr. at 19. Moreover, as pointed out by the ALJ, Plaintiff cares for her two minor

-31-

children on her own, and some of Plaintiff's activities showed an ability to be around people with no reports of distracting them with the hallucinations, as Plaintiff indicated that she drops her child off at school everyday, she took her children to a minor league baseball game, she performs light shopping, and she took her children to a trunk or treat at her daughter's place of employment. *Id.* at 23. And while Plaintiff emphasizes her reports that "she hears things once a week telling her to hurt people," she actually testified at the hearing that sometimes she hears things once a week and sometimes once a month. *Id.* at 51. She also testified that sometimes the voices tell her to hurt people or hurt herself, but she has never acted on it in any way. *Id*. at 51-52. Plaintiff also testified that the medication helps. *Id.* at 52. Further, Plaintiff did not indicate any problems when she worked before as she testified that at her last job, she was fired for using her cell phone and/or because the company was losing funding through welfare at the time. *Id*. at 42-44. She further testified that she left her job at the Toddler School because she got pregnant in 2009 and thereafter she was not inclined to return to work because, "[j]ust all the - - starting over and my body wasn't functioning, the depression and anxiety kicked in, and - - " she had no support or help after she had her child. *Id*. at 43-46. She indicated that she did not seek treatment for three or four years after and then she started at Unison and she felt better with medications and therapy. *Id*. at 44-45. And while Plaintiff contends that focus will be a problem due to her hallucinations, her concentration was at most times found to be unimpaired and adequate by her medication management nurse and her counselor. *Id*. at 306, 309, 327, 330, 332, 334, 336, 339, 356, 358, 360, 362, 364, 366, 368, 370, 372, 374, 376, 378, 382, 384, 386, 388, 390, 400, 402, 433, 437, 439, 441, 443, 445, 447, 449, 451, 453, 455, 457, 459, 461, 463, 465, 467, 491, 495, 499, 502, 504, 508.

For these reasons, the undersigned recommends that the Court find no merit to Plaintiff's assertions and find that substantial evidence supports the ALJ's mental RFC for Plaintiff in conjunction with her hallucinations. As pointed out by the ALJ, no medical reports discuss the severity of Plaintiff's hallucinations or the limitations resulting therefrom, Plaintiff consistently denied to her treating psychiatrist that she was suffering from hallucinations, and evidence was lacking as to the impact of the hallucinations on Plaintiff's ability to work with the mental RFC that the ALJ crafted for her.

Plaintiff also asserts that the ALJ's mental RFC should have contained additional limitations for her panic attacks.  ECF Dkt. #16 at 12-13.  She asserts that the ALJ should have accommodated her testimony that she could be around only 6 or less people at a time and the ALJ's limitation to occasional contact with supervisors and co-workers and no contact with the public was insufficient.  *Id.* at 15.  The ALJ considered Plaintiff's testimony concerning her panic attacks, noting that she testified that she has them when she was around groups of people and six people was too many for her to be around.  Tr. at 23.  However, the ALJ found that Plaintiff's symptoms and limitations were exaggerated as Plaintiff reported that she took her children to a minor league baseball game and stayed two hours without feeling panicked or overwhelmed, and she was planning on going to Cedar Point or to the zoo with her children.  *Id.*  He also noted Plaintiff's reports that she was taking medications only three times per week at time and she did not always comply with taking her medications, which negated the disabling nature of her limitations.  *Id.*

Moreover, no medical professional provided opinion evidence or a RFC assessment on behalf of Plaintiff concerning any limitations from her panic attacks.  The medical record shows that Plaintiff discussed having anxiety attacks or panic attacks only four times during her treatment at Unison.  The first time was at her initial assessment on August 14, 2013 when she reported anxiety attacks once a week.  Tr. at 297.  The home health worker's note on November 24, 2013 indicated as a barrier to progress that Plaintiff reported that she had anxiety attacks, which were a barrier to her working because she could not be around people.  *Id*. at 353.  Plaintiff also reported to her counselor on September 15, 2014 that she had a panic attack when dropping off her son at school.  *Id.* at 365.  On December 24, 2014, Plaintiff reported to her counselor that she was having passive suicidal ideation when she had her panic attacks.  Tr. at 297, 299. 353, 439.  Dr. Kazmi diagnosed Plaintiff with anxiety disorder, not otherwise specified, at his initial assessment of Plaintiff and he prescribed her anxiety medication.  *Id*. at 300.

Further, the ALJ attributed great weight to the state agency doctor's opinions that Plaintiff could interact occasionally and superficially in a smaller or more solitary and less public to nonpublic work setting and would do best in a more solitary and nonpublic work setting with no over the shoulder supervision.  Tr. at 23, citing Tr. at 85-86.  While the ALJ did not adopt in full the

restrictions opined by the state agency doctors, he was not required to do so and adequately explained that Plaintiff's reported activities were not consistent with the disabling symptoms and limitations that Plaintiff asserted. *Id.* at 23. Accordingly, he determined that Plaintiff could perform simple, repetitive and routine tasks, with no production rate pace, use of judgment for work-related decisions only, only occasional contact with supervisors and co-workers and no contact with the public. Tr. at 19. Substantial evidence supports this determination.

Plaintiff also asserts that the ALJ misinterpreted her PTSD diagnosis. ECF Dkt. #16 at 13. The ALJ indicated in his decision that Plaintiff testified that she had PTSD from "having her children." Tr. at 20. The undersigned notes that Plaintiff did in fact testify to this. *Id.* at 48. However, when the ALJ explained to Plaintiff that PTSD was a reaction to something that has happened in the past, she then stated that her reaction was to past child abuse and molestation. *Id.* at 49. The ALJ did not state this testimony in his decision and this is error, although he did find that Plaintiff's PTSD was a severe impairment. *Id.* at 16. Nevertheless, Plaintiff presents no evidence supporting restrictions from PTSD and no doctor opined any restrictions on Plaintiff's work-related abilities from PTSD. Accordingly, the undersigned recommends that the Court find that the ALJ committed harmless error in his interpretation of this impairment.

Plaintiff also complains that the facts of her "level of reported symptoms, [she] is on significant medication, [she] sees counselor and a psychiatrist, and that she has this level of residual limitations after a long period of treatment, indicates likelihood of needing more or longer breaks and potential for volatility in the work setting." ECF Dkt. #16 at 14. The undersigned recommends that the Court find no merit to this assertion as it is conclusory and is not supported by any medical opinion or record. The claimant bears the responsibility of providing the evidence used to make a RFC finding. 20 C.F.R. §§ 416.945(a)(3). Moreover, it is the ALJ that determines RFC, not a physician. 20 C.F.R. § 419.946(c). The ALJ did so in this case based upon Plaintiff's impairments and their consistency with the objective medical and other evidence, including a lack of medical opinions by Plaintiff's treating psychiatrist and counselor, her treatment, and her testimony of reported activities.

Finally, Plaintiff asserts that the ALJ erred by assuming that she was functioning at a high school educational level.  ECF Dkt. #16 at 15.  She cites to her testimony and reports that she had a learning disability, she was in special education classes throughout high school, and she did not take the state educational examinations.  *Id.*, citing Tr. at 59, 290, 294.  Plaintiff's testimony and reports to doctors concerning her educational level is insufficient to establish a learning disability or an educational level below that of a high school graduate.  Plaintiff points to no evidence diagnosing her with a learning disability or confirming that she took all special education classes.  Moreover, before the ALJ, when her counsel asked her about her reading abilities, Plaintiff reported that she is able to read and understand some articles in a newspaper, she prepared lesson plans at The Toddler School, although she said that she just copied other people's plans, she testified that she can buy things and make change at a grocery store and she can, for the most part, follow a recipe, including using a measuring cup.  *Id.* at 58-61.  In addition, the ALJ noted that Plaintiff can drive.  *Id.* at 17-18.  Plaintiff points to no support for a finding that the ALJ committed error in attributing a high school educational level for her.

Moreover, even if the ALJ did commit error, this error would be harmless because the inspector, sorter and packager jobs that the VE identified to the ALJ as available for a hypothetical person with Plaintiff's age, education and background and the ALJ's RFC, required only minimal reading and in many instances, only observation of the job in order to perform them.  Tr. at 69-70. Accordingly, even if the ALJ erred in assuming a high school educational level for Plaintiff, the limited educational level suggested by Plaintiff would not create reversible error because the jobs identified by the VE and adopted by the ALJ would still remain in such a situation.  Consequently, the undersigned recommends that the Court find no merit to Plaintiff's assertion of error and/or reversible error by the ALJ in the educational level that he determined for Plaintiff.

## VII.    RECOMMENDATION AND CONCLUSION

For the above reasons, the undersigned recommends that the Court AFFIRM the decision of the ALJ and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: January 28, 2019                          _/s/George J. Limbert_____
                                                GEORGE J. LIMBERT
                                                UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).